1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN ARLIN DONLEY, | No.  1:15-cv-01816-DAD-JLT (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| JEFFREY BEARD, | **[TWENTY-ONE DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner is currently serving a determinate sentence of 8 years and 8 months for his conviction of assault with a deadly weapon.  In this action, Petitioner claims the prosecutor committed misconduct for various reasons, his trial and appellate counsel provided him ineffective assistance, that the jury was biased against him and the trial court improperly imposed a sentence enhancement.  As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

## I.      PROCEDURAL HISTORY

Petitioner was convicted in the Madera County Superior Court on May 23, 2013, of one count of assault with a deadly weapon (Cal. Penal Code § 245(a)(1)), and two counts of felony vandalism (Cal. Penal Code § 594(b)(1)).  People v. Donley, No. F067912, 2015 WL 3493260, *1 (Cal. Ct. App. 2015).  Four prior prison term enhancements were also found to be true pursuant to Cal. Penal Code § 667.5(b).  Id.

1

1    Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

2    DCA").  The Fifth DCA stayed the eight-month term imposed for the vandalism convictions and

3    remanded the case to the trial court to amend the abstract of judgment.  Id.  In all other respects,

4    the judgment was affirmed on June 2, 2015.  Id.

5        Petitioner presented multiple petitions for writ of habeas corpus to the state courts

6    including the California Supreme Court.  All of the petitions were denied.  (LD[1] 17-32.)

7        On December 4, 2015, Petitioner filed the instant petition for writ of habeas corpus in this

8    Court.   (Doc. No. 1).  Respondent filed an answer on April 8, 2016.  (Doc. No. 14).  Petitioner

9    filed a traverse to Respondent's answer on June 20, 2016.  (Doc. No. 21.)

10   **II.    FACTUAL BACKGROUND**

11       The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

12   ***The Trial***

13   Donley was Angela Floyd's ex-fiancé and was involved in a relationship with her
     for almost three years. By January 2013, the relationship had ended and Floyd was
14   living alone in Ahwahnee, in a studio apartment that was attached to the garage of
     a house belonging to Marius Crisan, a retired police sergeant.
15

16   On January 17, 2013, Donley made several calls to Floyd during which he told her
     he wanted to take Floyd a file cabinet that belonged to her. Floyd told him not to
17   come over, that she did not want to be with him anymore, and that he was not
     welcome on the property. Nevertheless, at around noon that day, Donley drove his
18   truck to see Floyd. Crisan overheard Donley arguing with Floyd in her room and
     told him to leave, which he eventually did.

19   At approximately 1:00 p.m., Donley returned to Floyd's residence with her file
20   cabinet in the back of his truck and pushed the cabinet off the truck. As Donley
     yelled at Floyd through a closed door, Crisan again confronted Donley and told
21   him to leave. Donley replied, "Are you going to make me go, old man?" Crisan
     replied, "Well, if I have to, I will." Donley got angrier and started walking toward
22   Crisan, which prompted Crisan to pull out a gun and point it at Donley. After a
     few more comments were exchanged, Donley got in his truck. Instead of leaving,
23   however, Donley drove his truck in reverse over the file cabinet and got stuck.
     When he managed to get free, he drove about 400 feet to the end of the driveway
24   and stayed there for approximately 20 minutes yelling at Floyd.

25   After dark, while Roger Clark was visiting Floyd, Donley called again asking her
     to let him come over. Within seconds after Floyd told Donley that Clark was there,

26

27   [1] "LD" refers to documents lodged by Respondent.
     [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
28   Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
     2009).

Donley appeared in his truck in Crisan's driveway with his bright lights on. Floyd went outside her studio with Clark, saw Donley ram Clark's truck with his truck, and ran back to her studio. As she stood in the doorway, Floyd heard Donley say he was going to kill her. He then drove his truck full throttle at the studio, put on his brakes, and slid 20 feet into the doorway where Floyd had been standing, breaking the frame. Floyd managed to avoid being hit by doing a "back flip" over her bed. Meanwhile, Donley put the truck in reverse, hit Clark's truck again, and drove off.

Donley was arrested later that night at his mother house.

Donley, 2015 WL 3493260, at *1.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Madera County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

3

1    Williams, 529 U.S. at 412-413.

2         A state court decision is "contrary to" clearly established federal law "if it applies a rule

3    that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

4    of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

5    different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

6    406).

7         In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

8    an "unreasonable application" of federal law is an objective test that turns on "whether it is

9    possible that fairminded jurists could disagree" that the state court decision meets the standards

10   set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

11   application of federal law is different from an incorrect application of federal law.'" Cullen v.

12   Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

13   a federal court "must show that the state court's ruling on the claim being presented in federal

14   court was so lacking in justification that there was an error well understood and comprehended in

15   existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

16        The second prong pertains to state court decisions based on factual findings.  Davis v.

17   Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

18   Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

19   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

20   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

21   U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

22   factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

23   among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

24   1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

25        To determine whether habeas relief is available under § 2254(d), the federal court looks to

26   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

27   Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

28   2004).  "[A]lthough we independently review the record, we still defer to the state court's

1  ultimate decisions." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

2       The prejudicial impact of any constitutional error is assessed by asking whether the error

3  had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

4  <u>Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007)

5  (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and

6  reviewed it for harmlessness).

7       C.    Review of Claims

8       The instant petition presents the following grounds for relief: 1) The prosecutor

9  committed misconduct by suborning perjury from the victim; 2) The prosecutor committed

10  misconduct by failing to disclose an immunity agreement, and by refreshing the victim's

11  recollection by another person's statement; 3) Defense counsel rendered ineffective assistance by

12  failing to impeach the victim with her prior testimony; 4) The prosecutor committed misconduct

13  be calling attention to Petitioner's silence while in custody; 5) The prosecutor committed

14  misconduct by providing late discovery of jail telephone calls; 6) Trial counsel was ineffective in

15  numerous instances; 7) Appellate counsel rendered ineffective assistance by failing to raise the

16  issue of late discovery; 8) The jury was biased; and 9) The trial court improperly imposed an

17  enhancement pursuant to Cal. Penal Code § 667.5.

18       Except where noted, Petitioner's claims were presented in habeas petitions to the state

19  courts.  Although the state courts denied the claims on the merits, they did not provide a reasoned

20  decision.  To determine whether habeas relief is available under § 2254(d), the federal court looks

21  to the last reasoned state court decision as the basis of the state court's decision. <u>Ylst v.</u>

22  <u>Nunnemaker</u>, 501 U.S. 979, 803 (1991).  Where the state court decided the petitioner's claims on

23  the merits but provided no reasoning for its decision, the federal habeas court conducts "an

24  independent review of the record . . . to determine whether the state court [was objectively

25  unreasonable] in its application of controlling federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982

26  (9th Cir. 2002).  "[A]lthough we independently review the record, we still defer to the state

27  court's ultimate decisions." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

28  ///

1    1.    Prosecutorial Misconduct - Perjury

2    Petitioner first alleges the prosecutor committed misconduct by introducing perjured

3    testimony of the victim.  Petitioner claims that the victim lied when she testified that Petitioner

4    yelled, "I'm going to kill you after all, bitch!" prior to ramming his truck into the doorway of her

5    residence.  He further claims the victim lied when she testified that Petitioner beat her with a belt

6    on a previous occasion.  He contends the prosecutor knew or should have known this testimony

7    was false.

8    a.   Legal Standard

9    A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

10   the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v.

11   DeChristoforo, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial

12   misconduct must be "of sufficient significance to result in the denial of the defendant's right to a

13   fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S.

14   667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the

15   entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The

16   court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged

17   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the

18   aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance

19   of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982).  If prosecutorial

20   misconduct is established, and it was constitutional error, the error must be evaluated pursuant to

21   the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Thompson,

22   74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the

23   constitutional error was harmless.").

24   The knowing use of false or perjured testimony against a defendant to obtain a conviction

25   is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  In Napue, the Supreme Court held

26   that the knowing use of false testimony to obtain a conviction violates due process regardless of

27   whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when

28   it appeared.  Id. at 269.  The Court explained that the principle that a State may not knowingly use

6

1   false testimony to obtain a conviction - even false testimony that goes only to the credibility of

2   the witness - is "implicit in any concept of ordered liberty." Id.  Nevertheless, simple

3   inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

4   the admission of false testimony.  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).

5   "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."

6   Id.

7              b.  Analysis

8         The claim fails on its face because Petitioner does not demonstrate that the victim's

9   testimony was false.  The victim stated that as Petitioner backed up and immediately before

10  accelerating his vehicle into her house, Petitioner yelled, "I'm going to kill you after all, bitch."

11  (RT 712.)  Petitioner contends this testimony was false since no other witnesses testified to

12  hearing this statement.  While witnesses Davis and Clark did not testify that Petitioner stated

13  anything prior to ramming his vehicle into the residence, this does not show that the victim

14  committed perjury.  The fact that the victim was the only one to testify to hearing this statement

15  does not render her statement false.  Zuno-Arce, 339 F.3d at 889-90.  Rather, the alleged

16  inconsistencies and the credibility of the witnesses were factual determinations for the jury.  From

17  the evidence, a rational jurist could have found her testimony to be true.  Therefore, Petitioner

18  fails to show that the prosecutor committed misconduct.

19        The claim that the victim's preliminary hearing testimony and trial testimony were

20  inconsistent also fails.  That the statements were inconsistent does not render the testimony false.

21  At trial, the victim testified that on a previous occasion on May 14, 2012, Petitioner had struck

22  her with a belt and with his hands while the victim was naked.  (RT[3] 740.)  The victim also

23  testified that an officer asked her to take off her sweater to look at her marks, but she declined to

24  do so because she felt embarrassed and "stupid" from all the belt marks over her arms and back.

25  (RT 742.)

26        During the preliminary hearing concerning the May 14 incident, the victim testified that

27

28  _____
    [3] "RT" refers to the Reporter's Transcript on Appeal.

                                          7

1    she did not remember the entirety of that previous incident.  (LD 31, Prelim. Hr'g Tr. at 4, 19-20.)

2    Concerning the belt, the victim initially stated she did not remember if somebody had a belt.  (LD

3    31, Prelim. Hr'g Tr. at 20.)  However, the victim testified that she did remember talking to an

4    officer later that evening and recalled showing the officer her arms which had bruises up and

5    down.  (LD 31, Prelim. Hr'g Tr. at 21.)  She testified that she didn't remember how she sustained

6    those bruises, but she vaguely referenced having done some yardwork.  (LD 31, Prelim. Hr'g Tr.

7    at 21-22.)  When asked whether she recalled telling an officer that Petitioner had grabbed her

8    arms and pushed her up against a wall, she stated she did not.  (LD 31, Prelim. Hr'g Tr. at 26.)

9    She stated she did not recall having told an officer that the petitioner struck her arm with an open

10   hand.  (LD 31, Prelim. Hr'g Tr. at 27.)  She also stated she did not recall having told an officer

11   that the petitioner struck her with a belt in the same area, though she stated she did recall telling

12   the officer about a belt.  (LD 31, Prelim. Hr'g Tr. at 27.)  The victim at one point testified that the

13   petitioner "did not hurt [her] on purpose." (LD 31, Prelim. Hr'g Tr. at 28.)  She admitted later

14   that Petitioner wielded a belt and struck her, "[b]ut not purposely." (LD 31, Prelim. Hr'g Tr. at

15   37.)

16          Investigating officers also testified at the preliminary hearing concerning the May 14,

17   2012, incident.  Officer Leibee testified that she contacted the victim on May 14, 2012, and the

18   victim advised her that the petitioner had gotten mad at her because she didn't return home

19   promptly from the store.  (LD 31, Prelim. Hr'g Tr. at 46, 54.)  Leibee also testified that she asked

20   the victim to remove her sweater; the victim did, and Leibee observed bruises across both arms.

21   (LD 31, Prelim. Hr'g Tr. at 53.)  The victim told Leibee the bruises were a result of Petitioner

22   grabbing her arms.  (LD 31, Prelim. Hr'g Tr. at 53.)  The victim also told Leibee that Petitioner

23   slapped her on the left arm with an open hand. (LD 31, Prelim. Hr'g Tr. at 54.)  She told Leibee

24   that Petitioner then struck her in the same area with a belt.  (LD 31, Prelim. Hr'g Tr. at 55.)  In

25   addition, the victim stated Petitioner punched her in the shoulder.  (LD 31, Prelim. Hr'g Tr. at

26   56.)  Officer Leibee viewed injuries on the victim's body consistent with her statement.  (LD 31,

27   Prelim. Hr'g Tr. at 56-57.)

28          Officer Grijalva interviewed Maria Suarez who had been present during the incident.  (LD

8

31, Prelim. Hr'g Tr. at 70.)  Suarez stated she heard the victim and Petitioner arguing in another

room.  (LD 31, Prelim. Hr'g Tr. at 70.)  At one point she heard a slapping sound and then heard

the victim screaming and yell, "You're killing me."  (LD 31, Prelim. Hr'g Tr. at 70.)  This went

on for a period of 30 to 40 minutes whereupon Suarez left to go to the nearby 7-Eleven to buy

minutes for her cell phone so she could call 9-1-1.  (LD 31, Prelim. Hr'g Tr. at 71.)  When she

returned to the residence, she went to her bedroom.  (LD 31, Prelim. Hr'g Tr. at 71-72.)  Soon

thereafter, Petitioner ran into her bedroom and told her he needed help because he thought he had

broken the victim's ribs.  (LD 31, Prelim. Hr'g Tr. at 72.)  Suarez then went into the room and

saw the victim lying naked on the floor with several red welts all over her arms.  (LD 31, Prelim.

Hr'g Tr. at 72.)

The victim's testimony at the preliminary hearing and her testimony at trial were not

inconsistent as to any material fact.  The victim did not deny that Petitioner beat her during the

May 14, 2012, incident.  In fact, she admitted that he had struck her.  Moreover, based on the

testimonies of the investigating officers and the victim, there was overwhelming evidence that

Petitioner had beat her on that date.  Certainly, based on the victim's trial and preliminary hearing

testimonies, a rational jurist could have concluded that there was no reason for the prosecutor to

believe the victim's trial testimony was false.  The claim should be rejected.

    2.   Prosecutorial Misconduct – Failure to Disclose Immunity Agreement and
           Refreshing Recollection with Another Person's Statement

Petitioner next alleges the prosecutor committed misconduct by failing to disclose that she

gave the victim immunity on two drug-related offenses in exchange for her trial testimony.

Petitioner further faults the prosecutor for using statements made by another to refresh the

victim's recollection.

    a.  Analysis

The same legal standard set forth above applies here.  In addition, the "suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution."  Wearry v. Cain, 136 S.Ct. 1002, 1006 (2016) (quoting Brady, 373 U.S. at 87.)

1   Here, there is no indication of a deal between the prosecutor and the victim for her

2   testimony.  In fact, the record shows otherwise.  When the victim was asked whether she testified

3   so as to avoid arrest on outstanding drug-related bench warrants, the victim stated she had been

4   arrested when she arrived to testify.  (RT 755.)  Defense counsel wisely did not pursue the matter

5   further.  (RT 755.)

6   Petitioner also contends that the prosecutor committed misconduct by utilizing a police

7   report of the incident to refresh the victim's recollection because the police report contained

8   statements made by others.  Respondent is correct that determining what types of writings may be

9   used to refresh a victim's recollection is a matter of California evidentiary law, which cannot be

10   reviewed on habeas.  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  Moreover, there is no Supreme

11   Court precedent which holds that refreshing a witness' recollection with another's statement

12   violates a defendant's constitutional rights.  In fact, it is generally held that the memorandum used

13   to refresh a present memory may be made by one other than the witness, the established rule

14   being that it is not the memorandum that is the evidence, but the recollection of the witness.  See

15   Johnston v. Earle, 313 F.2d 686 (9th Cir. 1962); Hoffman v. United States, 87 F.2d 410, 411 (9th

16   Cir. 1937) ("It is not so important when the statement was made or by whom if it serves the

17   purpose to refresh the mind and unfold the truth."); United State v. Riccardi, 174 F.2d 883 (3rd

18   Cir. 1949), cert. denied, 337 U.S. 941 (1949); Head v. Logan, 39 Cal.App.2d 243, 245 (Cal. Ct.

19   App. 1940).  Petitioner's conclusory assertion of a due process violation neither carries his burden

20   of proof of establishing misconduct by the prosecution nor converts this state law question into a

21   cognizable matter on federal habeas review.  Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999)

22   (a petitioner may not transfer a state law issue into a federal one merely by asserting a violation of

23   due process).

24   For the foregoing reasons, the state court's rejection of Petitioner's claims of prosecutorial

25   misconduct were not contrary to or an unreasonable application of Supreme Court authority.  The

26   claim should be denied.

27       3.   Ineffective Assistance of Counsel – Failure to Impeach Victim

28   Petitioner claims that defense counsel failed to impeach the victim using her conflicting,

1   prior testimony.  He contends defense counsel failed to properly prepare for the cross-

2   examination of the victim, and failed to effectively cross-examine the victim.  He argues that had

3   counsel properly prepared and engaged in an effective cross-examination, the victim's perjury on

4   direct examination would have been revealed.

5              a.  Legal Standard

6         Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

7   Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

8   counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d

9   1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also

10  Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or

11  constructively denied the assistance of counsel altogether, the Strickland standard does not apply

12  and prejudice is presumed; the implication is that Strickland does apply where counsel is present

13  but ineffective).

14        To prevail, Petitioner must show two things.  First, he must establish that counsel's

15  deficient performance fell below an objective standard of reasonableness under prevailing

16  professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner

17  must establish that he suffered prejudice in that there was a reasonable probability that, but for

18  counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable

19  probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id.

20  The relevant inquiry is not what counsel could have done; rather, it is whether the choices made

21  by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

22        With the passage of the AEDPA, habeas relief may only be granted if the state-court

23  decision unreasonably applied this general Strickland standard for ineffective assistance.

24  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

25  federal court believes the state court's determination under the Strickland standard "was incorrect

26  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

27  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

28  is "doubly deferential" because it requires that it be shown not only that the state court

11

1   determination was erroneous, but also that it was objectively unreasonable. <u>Yarborough v.</u>

2   <u>Gentry</u>, 540 U.S. 1, 5 (2003). Moreover, because the <u>Strickland</u> standard is a general standard, a

3   state court has even more latitude to reasonably determine that a defendant has not satisfied that

4   standard. <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

5   application was unreasonable requires considering the rule's specificity. The more general the

6   rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

7                    b. <u>Analysis</u>

8          Petitioner concedes that defense counsel, Anita Torres, was provided discovery of all

9   evidence concerning allegations of prior acts of domestic violence committed by him. He also

10  concedes that defense counsel requested and obtained a 60-day continuance of trial in order to

11  gather evidence concerning the May 14, 2012, incident that the prosecution indicated they were

12  going to raise at trial. He further states that counsel received the transcript of the preliminary

13  examination concerning the May 14 incident.

14         At trial, the victim testified that she was beaten with a belt while naked. (RT 740.) She

15  testified that Petitioner struck her with his hands. (RT 740.) In addition, she stated she was

16  embarrassed to take her sweater off for the officer in order to view her bruising. (RT 742.)

17  Petitioner contends these statements were inconsistent or false in light of her testimony at the

18  preliminary hearing, and he faults defense counsel for failing to cross-examine her on these

19  points.

20         In his habeas petition to the California Supreme Court, Petitioner attached the informal

21  response of trial counsel concerning the claim she failed to adequately represent Petitioner by

22  impeaching the victim with her prior testimony. Defense counsel stated:

23         Petitioner's claim is meritless. There is absolutely no evidence that Ms. Floyd
           committed perjury during her testimony. Prior to the commencement of trial, I
24         urged Petitioner many times to accept a plea bargain, due to the fact that the
           evidence against him was very strong and was likely to include significant
25         domestic violence prior acts. I reviewed with Petitioner the prior acts evidence
           which the prosecutor informed me she was going to seek to admit. I advised
26         Petitioner that the effect of this evidence upon his trial would likely be devastating.
           The overall effect of the prior acts evidence showed that Petitioner had habitually
27         abused Ms. Floyd in an extremely cruel manner. Petitioner was convinced that the
           preliminary hearing transcripts in yet a different prior acts case (which the
28         prosecution was not seeking to admit) would prove Ms. Floyd to be a liar.

However, that was simply not true. I obtained those transcripts and in them, Ms. Floyd essentially admitted that the domestic violence perpetrated by Petitioner had taken place. However, she broke down on the witness stand and said that she did not want to press charges against Petitioner because "they had been doing so well together" shortly before his arrest. At no time in that hearing did Ms. Floyd state that she had lied to the police or that the abuse did not occur. The fight with Anthony Belt was in addition to the domestic violence which she had suffered.

Indeed, one of the most powerful moments of trial was when Ms. Floyd testified that Petitioner had "beat her with a belt naked." I'm not certain if this was the same incident as case F12903497, (the case which Petitioner erroneously believes proves that Ms. Floyd perjured herself) where she reported to police that Petitioner "struck her several times with a belt." I can say for certain that Ms. Floyd's testimony was entirely credible. At the end of her testimony, an absolute pall fell over the courtroom. Every single one of the jurors was looking at Petitioner and my stomach sank because I knew that, barring some miracle, we had just lost the case. I whispered to Petitioner that Ms. Floyd had won the jury over and he shrugged, as though her testimony had not meant anything whatsoever. He also stated that he was "rolling the dice" and did the hand gesture of throwing dice. Another client of mine, who had a court date during Petitioner's trial, complained to me that Petitioner was bragging distastefully to the other inmates in lock-up about various acts of domestic violence he had committed against Ms. Floyd. Furthermore, Petitioner had explicitly told me that the reason he was taking his case to trial (against my advice) was because he was certain Ms. Floyd would not testify against him (not because he was factually innocent).

Moreover, Ms. Floyd's testimony regarding Petitioner's assault with a deadly weapon was 100% consistent with her statements to the police. She had told the police immediately after the incident that she did not see Petitioner driving the truck; however, she believed he was the driver because she recognized his voice. Petitioner was yelling at her as he drove towards her and almost hit her with his truck (I don't have a copy of the record and don't recall at this time what he said). Ms. Floyd also believed that Petitioner was driving because of the fact that he had driven to her residence earlier in the day in the same truck and was harassing her and would not leave her residence.

I have tried many cases and as a result, have a good feel for when a case is close, when the prosecution is winning, and when I am winning. In this case, it was crystal clear to me that the evidence against Petitioner was overwhelming. As a result, I made the tactical decision to limit my impeachment of Ms. Floyd. This decision was based on three specific reasons. First, she was holding up well against my attempts to impeach her and I did not believe that she would break under cross-examination. For example, when I asked her, "Isn't the only reason you're here today because there is a no-bail warrant out for your arrest? She responded while crying, "No, I'm here because my oldest daughter told me that I'm her role model and that's why I should testify against him." I don't have a copy of the record so that is not an exact quote; but Ms. Floyd's response was something very close to that. It was quite powerful and indicated to me that she was not going to break.

Second, Ms. Floyd was consistent in her statements that she was not able to see the driver of the truck. This allowed me to argue that it was not proved beyond a reasonable doubt that Petitioner was driving the truck. Because the circumstantial evidence against Petitioner was very strong, I believed that it was outright impossible to win the trial. I also believed that we had one slim chance to hang it –

which was to hope that there was one very literal-minded person on the jury, who would be persuaded by the fact that there was no direct evidence against Petitioner. You can't have your cake and eat it too; and therefore, in order to make this argument, I had to ascribe some credibility to Ms. Floyd. I made the tactical decision to limit my impeachment of her, so that I could argue that the victim herself, a credible witness, admitted that she never saw Petitioner driving the truck.

Third, I limited my impeachment of Ms. Floyd because I was very fearful of emphasizing the prior acts evidence. It was extraordinarily clear from hearing the prior acts evidence on direct examination that Ms. Floyd had been a domestic violence victim at the hands of Petitioner for years and that Petitioner had been extremely cruel to her. I believed that delving into these prior acts in even more detail while trying to show minor or irrelevant inconsistencies would further alienate the jury, and hinder my attempt to get a hung jury. Regarding Petitioner's claims that I should have argued self-defense, Petitioner refused to testify. There was no evidence to support a self-defense claim, because the encounter with Marius Crisan had taken place earlier in the day and the court had ruled that that incident was not a basis for self-defense.

In the end, the evidence against Petitioner was overwhelming. There was absolutely no way to win the trial with the existing evidence, both for and against Petitioner. Although I used excellent judgment, was extremely well prepared, and fought very spiritedly for Petitioner, I am not a magician and cannot create good facts out of thin air. In fact, after the trial, several jurors including the foreperson stayed behind to speak with me and the prosecutor. The jurors told me that I had done an excellent job and that they gave a lot of thought to my reasonable doubt argument; however, they also told me that they completely believed Ms. Floyd and were convinced that they had reached the correct verdict.

(LD 31 at 350-353.)

Counsel's informal response reveals three tactical reasons she had for not cross-examining the victim concerning the minor inconsistencies in her trial testimony. First, she felt that the victim was holding up well against her attempts to impeach her as evidenced on several occasions during questioning. She felt that the victim would not break under further cross-examination. Second, the victim was consistent in her testimony that she was not able to see who the driver of the vehicle was. Defense counsel made a tactical decision to argue reasonable doubt as to the identity of the driver. In order to do this, counsel had to ascribe some credibility to the victim's testimony. Cross-examining her further would only undermine this tactic. Third, counsel noted that the prior act propensity evidence was very powerful. She believed that attacking the minor inconsistencies would only serve to highlight the evidence and further alienate the jury.

Petitioner fails to demonstrate that counsel's tactical decisions were unreasonable. Certainly, a rational jurist could find that counsel made a tactical decision and her alleged errors

14

1    were not so grave as to violate the Sixth Amendment.  In addition, a reasonable jurist could find

2    that Petitioner failed to establish any prejudice.  As noted by Respondent, the May 14 incident

3    was only one of several incidents of domestic violence against Petitioner.  (RT 724-42.)

4    Highlighting minor inconsistencies as to one incident would not have altered the outcome.

5    Rather, a rational jurist could conclude that doing so would only serve to show how the victim

6    was intimidated by the petitioner.  In addition, the victim's testimony was corroborated by other

7    witnesses, so any damage to her credibility would not have changed the outcome.

8         There is also no indication that counsel failed to properly investigate the case.  Petitioner

9    admits that counsel possessed all relevant materials.  His allegation that counsel failed to

10   investigate is pure speculation and unsupported by the record.  Accordingly, Petitioner fails to

11   show that counsel's performance was contrary to or an unreasonable application of the Strickland

12   standard.  The claim should be denied.

13        4.    Prosecutorial Misconduct – Comments on Petitioner's Silence

14        In his next claim of prosecutorial misconduct, Petitioner alleges that the prosecutor

15   violated his constitutional rights when the prosecutor argued that Petitioner's post-arrest, post-

16   Miranda[4], in custody silence during a recorded phone call was an adoptive admission that could

17   be used as evidence of his guilt.

18        During trial, the prosecution played recordings of the petitioner's jailhouse conversations

19   with his mother, his brother, and the victim.  (RT 746-51.)  The jury was provided with the

20   transcripts.   (CT[5] 117.)  In addition, the trial court granted the prosecution's request, over defense

21   objection, for a jury instruction on adoptive admissions.  (RT 908-09.)

22        During closing argument, the prosecutor made the following remarks concerning the

23   jailhouse recordings:

24        Let's look at some other statements. Let's look at the statement of the guilty mind.
         Let's look at the statements of the bully, who is sitting over there. We have the
25        recorded statements of the defendant on various phone calls.

26        March 3rd he calls Angela Floyd. "Are you coming to court or what? You are not,

27   _____

     [4] Miranda v. Arizona, 384 U.S. 436 (1966).
28   [5] "CT" refers to the Clerk's Transcript on Appeal.

right, avoid the subpoena." He still wants to keep her out of here, keep her controlled. March 12th, 2013. "If she says she is going to come to court, she is going to come to court and she is going to fuckin' screw me. But my homeboy, Andrew, he gets out of here real soon. He is going to make sure she don't come to court. They will make sure she don't come to court." That's a statement of a guilty mind. Ask yourselves why does this bully want to keep Angela Floyd out of court so bad?

April 9th, 2013. "I am talking about me going back to court and trying to see if we can't somehow get her to shut up." That's what he is good at. He is good at getting her to shut up. He is good at hitting her, swearing at her and good at beating her down. April 15th his own mother asked, "What did you hit with the truck?" What's his reply? "Why do you ask?" He doesn't say Jimmy was driving. He doesn't say, okay, mom, I was really there and Jimmy was driving. And he has never driven my truck before. And we got up there and we realized maybe we shouldn't be here and we should leave and Jimmy is such an idiot.

He accidentally ran into the house with his car and we left. Sorry, he doesn't say that. The defendant has a guilty conscious. He says to his own mother, "Why do you ask?" He doesn't say it was an accident. His mother says, and "It's not very much, it's not very much." The defendant says, "I know." He knows. He knows what happened. His mom says, "So I just wondered what you hit to scratch it." And the defendant says, "I don't know. I don't know." But that is in Angela Floyd's driveway.

(RT 953-54.)

The prosecutor also commented on Petitioner's statements during rebuttal:

If you conclude that someone made a statement outside of court, accusing the defendant of the crime or connecting the defendant with the crime and the defendant did not deny it, you must decide whether each of the following is true. The defendant – the statement was made by the defendant. The defendant heard and understood the statement. The defendant would under all the circumstances and actually have denied the statement if he thought it wasn't true. And the defendant could have denied it but did not.

April 15th is the conversation that I am talking about here, the conversation with his mother. "What did you hit with the truck?" "Why do you ask?" He had the opportunity to deny it. He did not. Also look at the other recordings the defendant doesn't want Angela Floyd to come to court. He doesn't want her to testify. What he wants is for her to shut up. That, ladies and gentlemen – those are the words of a guilty man. He is sitting right there, please find him guilty.

(RT 980-81.)

Defense counsel also addressed this issue in her informal response to the state habeas petition:

Despite my repeated warnings to Petitioner that he should not talk to anyone about his case via telephone due to the fact that he was incarcerated and the jail was recording his calls, Petitioner chose to engage in many such conversations. For

example, he contacted the victim, Ms. Floyd, and attempted to persuade her not to come to court and testify against him. He also contacted his brother and mother in separate phone calls and bragged to them that he had gotten some associates to ensure Ms. Floyd would not testify against him. When he made this claim to his mother, she responded something in a skeptical or sarcastic tone. So convinced was he that his powers of persuasion (or simply fear) would convince Ms. Floyd not to testify, Petitioner did not recognize the skepticism in his own mother's voice. Their conversation continued, and finally Petitioner's mother asked him: "Why did you do it, Shawn? Why did you hit her with your car?" Petitioner's response was dead silence. A long pregnant pause. No denial and no proclamation of innocence whatsoever. Just a really loud silence – in other words, an adoptive admission.

(LD 31 at 349-50.)

> a. <u>Legal Standard and Analysis</u>

The legal standard for prosecutorial misconduct is set forth above.  In addition, in <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976), the Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving <u>Miranda</u> warnings, violated the Due Process Clause of the Fourteenth Amendment."   Petitioner contends the prosecutor violated <u>Doyle</u> by commenting on his silence while in custody and after <u>Miranda</u> warnings had been given.

<u>Doyle</u> does not aid Petitioner here.  In <u>Doyle</u>, the defendant was observed transacting a drug sale and was soon after arrested.  <u>Id</u>. at 611-16.  After the defendant was given <u>Miranda</u> warnings, he remained silent.  <u>Id</u>.  At trial, the prosecution cross-examined the defendant as to why he did not provide his exculpatory story to the police when he was arrested.  <u>Id</u>.  Here, however, the conversation occurred between Petitioner and private parties.  The Supreme Court has not held that <u>Doyle</u> applies to conversations between defendants and private parties, <u>see</u> <u>Burton v. Lewis</u>, 2012 WL 2322495, *8 (C.D. Cal. 2012), and courts have held that <u>Doyle</u> does not, <u>see</u>, <u>e.g.</u>, <u>Southerland v. Berghuis</u>, 2006 WL 1007888 (E.D. Mich. 2007); <u>People v. Hollinquest</u>, 190 Cal.App.4th 1534, 1556 (2010), <i>cert. denied</i>, 132 S.Ct. 310 (2011); <u>State v. Neeper</u>, 160 N.H. 11, 14-15 (2010); <u>People v. Long</u>, 316 Ill.App.3d 919, 931 (2000).  Regardless, in the absence of any clearly established Supreme Court authority on the issue, Petitioner is not entitled to habeas relief.  <u>See</u> <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a

1   specific legal rule that has not been squarely established by this Court") (citations and internal

2   quotations omitted); <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) ("Because our cases give no

3   clear answer to the question presented, ... it cannot be said that the state court unreasonably

4   applied clearly established Federal law") (citation, internal brackets and quotations omitted);

5   <u>Moses v. Payne</u>, 555 F.3d 742, 758–59 (9th Cir. 2009) (habeas relief unavailable where United

6   States Supreme Court had articulated no "controlling legal standard" on the issue).

7       Petitioner has not shown the state court rejection of this claim to be contrary to, or an

8   unreasonable application of, Supreme Court authority.  Therefore, the claim should be rejected.

9       5.    <u>Brady Error – Providing Late Discovery</u>

10      Petitioner next alleges the prosecutor committed <u>Brady</u>[6] error by failing to disclose the

11  recorded jail conversations until after trial began and just prior to the victim's direct examination.

12  Petitioner alleges the prosecution knew of these conversations as early as March 3, 2013, but it

13  was not provided until May 20, 2013.  He complains that the suppression of these recordings until

14  such a late date interfered with his right to counsel by preventing counsel from conducting a

15  complete and effective investigation into the evidence.

16      On the second day of the People's case, the prosecutor discussed the fact that she had just

17  recently received the jailhouse conversations and had provided them to defense counsel, as

18  follows:

19      THE COURT: …Ms. Wise, do you have an issue?

20      MS. WISE: Yes. As of 1:30, two minutes ago, I have not had contact yet with Ms.
21      Floyd. I did spend my lunch hour listening to jail phone calls between the
        defendant and his mother and various other people. On May 2nd there's a jail
22      phone call. The defendant is asking, "She is not coming, right?" And the male
        voice said, "I will talk to her." And the defendant did contact Ms. Floyd directly
23      on one of the calls, telling her to avoid a subpoena. That was earlier in this case.
        And on March 12, 2013, the defendant mentions to his mother that "A person
24      named Andrew is getting out next week, make sure she--" I take it that is Ms.
        Floyd – "won't come to court," And April 9th, 2013, the defendant made another
25      phone call and he told his mom that he is trying to get her to shut up and get his
        brother to write her a letter. And People believe that the defendant, I guess, has
26      now finally succeeded in intimidating Ms. Floyd into not coming into court.

27      THE COURT: Ms. Torres?

28  _____
    [6] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

MS. TORRES: Your Honor, I have not been able to listen to the jail phone calls yet. I believe Ms. Wise e-mailed them to me yesterday afternoon at some point. And because I recently switched offices a couple of days ago, my computer wasn't set up for me until this morning. So I did not notice that I had the e-mail from Ms. Wise that contained – appeared to contain a lot of audio files, but I haven't had an opportunity to listen to them yet.

THE COURT: Well, Ms. Wise, do you have those transcribed yet?

MS. WISE: I just received them myself yesterday afternoon. I have not transcribed them. Deputy Schoettler has them on the phone.

(RT 673-674.)

The next day, the prosecution moved to introduce the conversations.  (RT 720-23.) Defense counsel stated she had reviewed the conversations and objected on grounds of prejudice, hearsay, and foundation.  (RT 722-23.)  The trial court overruled the objections and the phone calls were played for the jury.  (RT 744-45.)

Defense counsel also addressed this claim in her informal response, as follows:

The prosecutor provided me with Petitioner's recorded conversations as soon as practically possible. I had adequate time to review and analyze all of Petitioner's recorded conversations which the prosecutor sought to introduce into evidence. In fact, the court held a lengthy in limine conference on the admissibility of the jail calls wherein I objected to their admissibility both in whole and in part on foundational, hearsay, and Evidence Code section 352 grounds. As a result of my objections, the court excluded some of the calls in part. Regarding the specific statement Petitioner is referring to in this contention, the court explicitly ruled it admissible an adoptive admission, and therefore an exception to the hearsay rule. The prosecutor limited her argument by referring to it as such, and never argued to the jury that Petitioner must be guilty because he did not testify.

(LD 31 at 349-350.)

>    a.   Legal Standard

Due process requires that the prosecution disclose exculpatory evidence within its possession. Brady v. Maryland, 373 U.S. 83, 87 (1963); Cooper v. Brown, 510 F.3d 870, 924 (9th Cir. 2007).  This obligation encompasses the duty to discover and produce favorable evidence known to others acting on the government's behalf in the case, such as other agencies involved in the investigation or prosecution of the defendant.  Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Zuno–Arce, 44 F.3d 1420, 1427 (9th Cir.1995).

There are three components of a Brady violation: "[t]he evidence at issue must be

19

1   favorable to the accused, either because it is exculpatory, or because it is impeaching; the

2   evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

3   must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999).  The third element,

4   prejudice, is also described as materiality.  See Benn v. Lambert, 283 F.3d 1040, 1053 n. 9 (9th

5   Cir. 2002) (explaining that, "for Brady purposes, the two terms have come to have the same

6   meaning").  Evidence is material under Brady if there is a "reasonable probability that, had the

7   evidence been disclosed to the defense, the result of the proceeding would have been different."

8   Kyles, 514 U.S. at 433–34 (internal quotation marks and citation omitted).

9           b.  Analysis

10          The claim fails for several reasons.  First, the evidence was not exculpatory or favorable to

11  the accused in any way.  Therefore, the first component of Brady is not implicated.  See Gray v.

12  Netherland, 518 U.S. 152, 154 (1996) (a defendant "does not have a constitutional right to notice

13  of the evidence which the state plans to use to prove the charges, and Brady, which addressed

14  only exculpatory evidence, did not create one.").

15          Second, the record does not indicate that the prosecution suppressed the evidence or failed

16  to provide it in a timely fashion.  Rather, the record shows that the prosecutor had only recently

17  acquired the evidence when she disclosed it to the court, and she was in the process of reviewing

18  it to determine its value.  The record further indicates that the prosecutor provided the defense

19  with the recordings on the same day she received them.  In addition, as Respondent points out, the

20  defense had notice of the jailhouse conversations because Petitioner made the phone calls and he

21  was advised that his conversations would be recorded.  Therefore, there was no failure to disclose

22  on the part of the prosecution, and the second component of Brady is non-existent.

23          Third, the final component of Brady is not met because the evidence was in fact disclosed

24  to the defense at the earliest possible time.  Therefore, the question of whether there is a

25  reasonable probability that, had the evidence been disclosed to the defense, the result of the

26  proceeding would have been any different, is moot.  Even if the material had been disclosed

27  earlier, Petitioner fails to show any prejudice.

28          Accordingly, Petitioner fails to demonstrate that the state court rejection of his claimed

1   <u>Brady</u> violation was contrary to or an unreasonable application of Supreme Court precedent.

2         6.    <u>Ineffective Assistance of Counsel</u>

3         Petitioner next complains his defense counsel rendered ineffective assistance in a number

4   of instances.  He alleges counsel: 1) failed to investigate materials and evidence relating to

5   allegations of prior acts of domestic violence that the State presented during its case-in-chief; 2)

6   failed to present a defense based on self-defense; 3) failed to highlight contradictory statements

7   concerning the assault in Clark's and the victim's testimony; 4) failed to object to the prosecutor's

8   use of Petitioner's out-of-court, post-arrest, post-<u>Miranda</u>, in custody silence during closing and

9   rebuttal; 5) breached the attorney-client privilege by discussing his case with other clients; 6)

10  failed to argue that one of Petitioner's priors was for a civil addict commitment and should not

11  have been treated as a prison prior; and 7) failed to assist appellate counsel in the preparation of

12  the appeal.[7]

13        a.    <u>Legal Standard</u>

14        As previously set forth, claims of ineffective assistance of counsel are reviewed according

15  to <u>Strickland's</u> two-pronged test.  To prevail, Petitioner must show two things.  First, he must

16  establish that counsel's deficient performance fell below an objective standard of reasonableness

17  under prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 687-88.  Second, Petitioner must

18  establish that he suffered prejudice in that there was a reasonable probability that, but for

19  counsel's unprofessional errors, he would have prevailed on appeal.  <u>Id</u>. at 694.  In addition, the

20  AEDPA standard is "doubly deferential" because it requires that it be shown not only that the

21  state court determination was erroneous, but also that it was objectively unreasonable.

22  <u>Yarborough</u>, 540 U.S. at 5.

23        b.    <u>Analysis – Failures Regarding Prior Acts Evidence</u>

24        As noted by Respondent, this claim is mostly duplicative of the third claim, wherein

25  Petitioner claimed that counsel failed to investigate and cross-examine the victim concerning her

26  _____

27  [7] Petitioner also lists as a subissue a claim that the prosecutor violated his right to counsel by failing to disclose an immunity agreement with the victim.  Petitioner presents no valid argument as to how this failure by the prosecution caused him to be denied the right to effective assistance of counsel.  In any case, the claim that the prosecutor failed

28  to disclose an immunity agreement was previously discussed in claim two, *supra*.

testimony at the preliminary hearing.  For the same reasons stated in the third claim, the instant claim should be denied.  In addition, Petitioner faults counsel for failing to investigate police reports so as to undermine the credibility of witnesses, but he does not state what these police reports would have revealed and how they could have undermined witness credibility.  Thus, the claim is conclusory and unsupported and should be rejected as such.  James v. Borg, 24 F.3d 20, 26 (9th Cir.1994).

### c.   Analysis – Failure to Argue Self-Defense

According to the petitioner, he and two others came to the victim's residence because the victim summoned them.  When they arrived, Crisan pointed a gun at them.  In response, they attempted to flee but the truck's transmission engaged in forward rather than reverse, whereupon the truck struck the victim's residence.  The truck was then placed in reverse and they fled.  In light of this, Petitioner complains that defense counsel should have argued self-defense.

As noted by Respondent, however, this version of events was factually unsupportable. Petitioner's friend, Barry Davis, testified that he and his cousin, Jimmy McCormick, drove to the victim's residence.  (RT 772-775.)  Davis testified that they encountered a man with a gun who told them to leave, and McCormick accidentally hit the residence and another truck that was parked in the driveway.  (RT 775-776.)  Defense counsel attempted to call McCormick, but McCormick failed to appear.  (RT 781-82.)  Petitioner also did not testify.

During closing, defense counsel stated that Crisan had summoned Clark for aid and that it was likely Clark who was the person with a gun they encountered at Crisan's property.  (RT 966-67.)  Defense counsel argued that when they saw the gun, McCormick probably panicked and accidentally crashed the vehicle into the residence and parked truck in their attempt to flee.  (RT 967.)

In addition, defense counsel made an informal response to this claim in the state courts, as follows:

> Regarding Petitioner's claims that I should have argued self-defense, Petitioner refused to testify.  There was no evidence to support a self-defense claim, because the encounter with Marius Crisan had taken place earlier in the day and the court had ruled that incident was not a basis for self-defense.

22

1  (LD 31 at 353.) Given this, Petitioner fails to demonstrate that counsel acted improperly.  There

2  was no evidence available for the theory of self-defense.  Counsel attempted to argue that it was

3  McCormick who drove the truck and his actions were accidental.  A reasonable jurist could find

4  that counsel presented the evidence that was available to her.  In addition, in light of the lack of

5  evidence of self-defense, Petitioner fails to show any prejudice resulting from counsel's alleged

6  omission.  Therefore, the claim should be rejected.

7        d. Analysis – Contradictions between Clark's and Floyd's Testimony

8     Petitioner claims that defense counsel should have highlighted the differences between

9  Clark and the victim's testimony.  Petitioner does not expound on this claim.  It should be

10  rejected as conclusory.  James, 24 F.3d at 26.

11        e. Analysis – Adoptive Admission

12     Petitioner alleges defense counsel failed to object to the prosecutor's use of Petitioner's

13  out-of-court, post-arrest, post-Miranda silence against him during closing remarks and rebuttal.

14  As discussed in claim four, *supra*, a reasonable jurist could have concluded that the prosecutor

15  did not comment on Petitioner's silence, but rather on his answers to the questions from his

16  mother, brother, and the victim.

17     Moreover, even if the prosecutor's remarks were construed as directed toward Petitioner's

18  "silence," as previously discussed, Doyle and Griffith do not apply in his case.  The conversations

19  were between the petitioner and a private party, and no Supreme Court authority bars the use of

20  such conversations.  See Burton, 2012 WL 2322495, *8; Hollinquest, 190 Cal.App.4th at 1556.

21  Therefore, a reasonable jurist could have concluded that any objection would have been denied.

22  Counsel cannot be faulted for failing to make a meritless objection.  Jones v. Smith, 231 F.3d

23  1227, 1239 n.8 (9th Cir. 2000).  The claim should be denied.

24        f. Analysis – Breach of Attorney-Client Privilege

25     Petitioner claims that defense counsel breached the attorney-client privilege by discussing

26  his case with another client of hers.  Petitioner references defense counsel's informal response to

27  the state petitions, wherein she stated:

28      Indeed, one of the most powerful moments of trial was when Ms. Floyd testified

23

that Petitioner had "beat her with a belt naked." I'm not certain if this was the same incident as case F12903497, (the case which Petitioner erroneously believes proves that Ms. Floyd perjured herself) where Petitioner "struck her several times with a belt." I can say for certain that Ms. Floyd's testimony was entirely credible. At the end of her testimony, an absolute pall fell over the courtroom. Every single one of the jurors was looking at Petitioner and my stomach sank because I knew that, barring some miracle, we had just lost the case. I whispered to Petitioner that Ms. Floyd had won the jury over and he shrugged, as though her testimony had not meant anything whatsoever. He also stated that he was "rolling the dice" and did the hand gesture of throwing dice. *Another client of mine, who had a court date during Petitioner's trial, complained to me that Petitioner was bragging distastefully to the other inmates in lock-up about various acts of domestic violence he had committed against Ms. Floyd.* Furthermore, Petitioner had explicitly told me that the reason he was taking his case to trial (against my advice) was because he was certain Ms. Floyd would not testify against him (not because he was factually innocent).

(LD 31 at 351 (emphasis added).)

Upon review of the statement, there is no indication that defense counsel breached the attorney-client privilege by discussing the case, or that Petitioner suffered any prejudice therefrom.  The statement reflects only that a client complained to defense counsel about Petitioner's behavior.  Claiming that this statement shows she discussed the details of his case is pure conjecture and speculation.  The claim should be denied.  James, 24 F.3d at 26.

### g.   Analysis – Prior Civil Addict Commitment

Petitioner next claims that defense counsel was ineffective in failing to argue that one of his prison priors was for a civil addict commitment and should not have been used as a prior to increase his sentence.  He states he had been committed to the California Rehabilitation Center (CRC) which rendered the prior ineligible for a one-year enhancement under California law.

As will be discussed below in claim nine, the California Supreme Court denied the claim that he was ineligible for the one-year enhancement on this prior.  The state courts determined that the Cal. Penal Code § 667.5 enhancement had been properly imposed.  This Court is bound by a state court's determination of its own law.  Sarausad, 555 U.S. at 192 n.5.  Since any objection would have been meritless, and counsel cannot be faulted for failing to make a meritless objection, the claim fails.

### h.   Analysis – Aiding Appellate Counsel

Petitioner argues that defense counsel rendered ineffective assistance by failing to assist

24

appellate counsel in preparation of the appeal.  Specifically, he claims defense counsel lied to appellate counsel about the discovery of the recordings of the jail phone calls.  Defense counsel provided the following in her informal response to the state habeas petitions:

> The prosecutor provided me with Petitioner's recorded conversations as soon as practically possible. I had adequate time to review and analyze all of Petitioner's recorded conversations which the prosecutor sought to introduce into evidence. In fact, the court held a lengthy in limine conference on the admissibility of the jail calls wherein I objected to their admissibility both in whole and in part on foundational, hearsay, and Evidence Code section 352 grounds. As a result of my objections, the court excluded some of the calls in part. Regarding the specific statement Petitioner is referring to in this contention, the court explicitly ruled it admissible as an adoptive admission, and therefore an exception to the hearsay rule. The prosecutor limited her argument by referring to it as such, and never argued to the jury that Petitioner must be guilty because he did not testify.

(LD 31 at 349-350.)

In addition, Petitioner provided letters from his appellate counsel in his state habeas petitions which bear on this topic.  In one letter, appellate counsel wrote:

> Transcripts of five audio tapes and a CD of the tapes were admitted into evidence at trial. The CD was played for the jury, and the voices were identified by the victim. The physical CD played for the jury was not prepared until the beginning of trial. Defense counsel informed me that she was given the audio tapes during pretrial discovery, so no <u>Brady</u> violation occurred.

(LD 31 at 399-400.)

In another letter, appellate counsel stated:

> I discovered that [defense counsel] Ms. Torres had left Mike Fitzgerald's firm and located her on my own. When I spoke with her on the telephone, she was very clear that there was no last minute production of the audio tapes.

(LD 31 at 402.)

Later, appellate counsel again addressed the discovery of the jail phone calls:

> First, I must make it clear to you that I am not agreeing with you that [defense counsel] Ms. Torres lied about when she received the recordings. I have not seen any evidence that she lied. The fact that she did not send me the transcripts from the Fresno case does not mean that she lied about when she received the recordings.

(LD 31 at 404.)

As previously discussed in claim four above and as shown in the statements above, there is no indication that defense counsel received the disclosure of the taped jail recordings late, or that defense counsel lied about when she received the disclosure.  Given the record, there is no

1   indication that defense counsel lied to appellate counsel.  In addition, Petitioner fails to show any

2   prejudice.  The claim should be rejected.

3              i.   Conclusion

4       In summary, Petitioner fails to demonstrate that the state court rejection of his multiple

5   claims of ineffective assistance of counsel were contrary to or an unreasonable application of the

6   Strickland standard.  The claims should be denied.

7       7.      Ineffective Assistance of Appellate Counsel

8       Petitioner claims appellate counsel rendered ineffective assistance by failing to raise all of

9   the issues he sought to raise and that he later presented in his state habeas petitions.  In particular,

10  he faults appellate counsel for failing to present the claimed Brady violation for the prosecutor's

11  alleged failure to timely disclose the jail recordings.

12      In challenges to the effective assistance of appellate counsel, the same standards apply as

13  with claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285

14  (2000); Smith v. Murray, 477 U.S. 527 (1986).  In Robbins, the United States Supreme Court

15  indicated that an appellate attorney filing a merits brief need not and should not raise every non-

16  frivolous claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in

17  order to maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement

18  that an appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627

19  F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

20      Here, the Court has already concluded that trial counsel was not ineffective under the

21  Sixth Amendment.  Therefore, it necessarily follows that appellate counsel could not have been

22  ineffective for failing to raise issues related to trial counsel's incompetence.  Accordingly, the

23  claim should be denied.

24      8.      Juror Bias

25      Petitioner claims that the jury was biased against him for two reasons.  First, during voir

26  dire, Juror No. 2 informed the trial court that she believed she knew one of the defense witnesses,

27  and stated that as a juvenile, the witness "slashed tires down my neighborhood, and mine was

28  included."  The trial court excused the juror and instructed the rest of the jury pool to disregard

the statements.  A motion for mistrial was denied.

Second, after trial began, Juror No. 4 informed the court that he had attended a birthday party for the son of the State's witness and investigator, Deputy Schoettler.  The juror was not excused and no motion for mistrial was entered.

            a.  Background

During voir dire, the following occurred:

JUROR No. 2: I believe I know one of the witnesses.

THE COURT: How do you know him?

JUROR NO. 2: If he was originally from Chowchilla, I know his family. And he actually – if it's the same person, I am assuming it's the same one, but whenever he was underage, him and a friend had slashed tires down my neighborhood and mine was included.

THE COURT: Ms. Wise, do you know if he ever lived in Chowchilla? Do you know how old this individual would be?

JUROR NO. 2: Probably around late 20's, early 30's.

MS. WISE: It's the defense witness, Your Honor. And I am providing some information.

MS. TORRES: It may very well be the same person.

THE COURT: Meets the age.

MS. TORRES: I believe so.

THE COURT: So do you think you could be fair?

JUROR NO. 2: (No audible response.)

THE COURT: I will excuse you. If you could report to the jury commissioner on your way out. Now ladies and gentlemen, we just don't want to take a chance. Please disregard what Ms. Miller said because it may or may not be true. And that's not for you to judge unless that kind of evidence comes out so –

(RT 468-469.)

The next day, defense counsel moved for a mistrial:

MS. TORRES: Yes. Your Honor, I'm requesting to make a Motion for Mistrial. And it's based on – it was – I believe it was one of Potential Juror Number 2's comments regarding defense witness, Barry Davis. She did state in open court in front of the entire jury panel that she believed Barry Davis would slash tires in her neighborhood when he was a juvenile. And it was, I guess, affirmed in open court that he was of the same age, and that this was likely the same person because he's from Chowchilla –

THE COURT: We did not affirm that he was from Chowchilla.

MS. TORRES: Okay. Well, it seemed – it appeared to the potential jurors, at least, that it was affirmed it was the same person. And I think that as a result of that juror's comments, the whole jury pool was tainted. Everybody heard the comments. And, additionally, Mr. Davis does have some moral turpitude priors, but I don't believe that was one of them. So that would be even in addition to the priors he already has, and that may be admissible to impeach him if he testifies.

THE COURT: All right. Well, the motion is denied. The witness – we weren't sure. I told her that we could not confirm if that was the same person or not. But out of the abundance of caution, we were going to excuse her. I also, as she was being excused, told the remaining panel that it wasn't known whether this was the same person. And they weren't to even consider what Ms. Alford had to say, and that they should disregard all of that.

And I believe that is sufficient. I don't believe that, especially given the fact that if Mr. Davis testifies, there will be some moral turpitude impeachment. I don't believe that that substantially prejudices Mr. Donley.

(RT 606-607.)

As to Juror No. 4, after the jury was impaneled but before the presentation of evidence, the district attorney reported that the State's witness, Deputy Schoettler, had contact with one of the jurors the previous weekend:

MS. WISE: …And the next day, Deputy Schoettler was having a birthday for his son. His son's best friend's dad is Juror No. 4. And they never met before. Apparently Deputy Schoettler's wife has met Juror No. 4. And I believe Juror No. 4 got the invitation and didn't know about the party until Friday.

THE COURT: So what happened?

MS. WISE: Pardon?

THE COURT: So he showed up at the party?

MS. WISE: Yes.

THE COURT: Did you discuss anything?

DEPUTY SCHOETTLER: We talked briefly about our kids and I explained to him that I wouldn't be able to talk to him due to the case and –

(RT 612.)

The court and defense counsel then questioned Juror No. 4:

THE COURT: And we have Juror No. 4…I understand that you ran into somebody this weekend?

JUROR NO. 4: I did, yes.

THE COURT: All right. And could you explain how that occurred?

28

JUROR NO. 4: Sure. My son was invited to a classmate's birthday party so I took him to the party, would have been Sunday afternoon, and turned out that his classmate was Deputy Schoettler's son. So he was at the birthday party as well, obviously, since it was for his son.

THE COURT: Did you converse with Deputy Schoettler?

JUROR NO. 4: Hello. Nothing more than your basic pleasantries. I guess Deputy Schoettler made it a point to say that we shouldn't be talking or anything, so basically I spent the whole time following my son around, making sure he didn't hurt himself.

THE COURT: Anything about that experience that would cause you to have a doubt as to your ability to be fair and impartial now?

JUROR NO. 4: No, sir.

THE COURT: All right. Ms. Torres, do you wish to inquire?

MS. TORRES: Thank you, Judge. Juror No. 4, do you feel that now that you know that your son's – one of your son's good friends at school is Deputy Schoettler's son – knowing that you might see Deputy Schoettler in the future, would that impact the way you view the evidence or the way you might possibly come to a verdict?

JUROR NO. 4: I don't feel that I know him any better now than I did last week. I don't think anything would change from then to now.

MS. TORRES: You are still in the same position, you feel that you could give Mr. Donley a fair trial?

JUROR NO. 4: Without a doubt.

MS. TORRES: Nothing further.

(RT 614-615.)

> b. <u>Legal Standard</u>

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial  . . . by an impartial jury."  U.S. Const., Amends. 6 and 14; <u>see</u> <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." <u>United States v. Klee</u>, 494 F.2d 394, 396 (9th Cir.1974).  Although it is generally preferred that a trial court hold an evidentiary hearing when allegations of juror misconduct arise, it is not always required, particularly when the court knows the exact scope and nature of the misconduct.  <u>See</u> <u>United States v. Halbert</u>, 712 F.2d 388, 389 (9th Cir.1983).  The Court is mindful of the fact that

29

1    "it is virtually impossible to shield jurors from every contact or influence that might theoretically

2    affect their vote." <u>Rushen v. Spain</u>, 464 U.S. 114, 118 (1983) (quoting <u>Smith v. Phillips</u>, 455

3    U.S. at 217).

4            c.   <u>Analysis</u>

5            A reasonable jurist could find that the jury was not biased against Petitioner in violation of

6    his constitutional rights.  Juror No. 2 was excused from the venire and there is no indication that

7    the statements had any effect.  Moreover, the trial court admonished the jury to disregard the

8    comments.  Finally, the defense witness admitted to having criminal convictions, so any possible

9    bias stemming from Juror No. 2's comments would not have been prejudicial.

10           Juror No. 4 was questioned by the court and defense counsel and affirmed that the slight

11   contact he had with Deputy Schoettler had no effect on his ability to provide the petitioner with a

12   fair trial.  As noted by Respondent, the Supreme Court has "long held that the remedy for

13   allegations of juror partiality is a hearing in which the defendant has the opportunity to prove

14   actual bias." <u>Smith v. Phillips</u>, 455 U.S. at 215.  After a full hearing on the matter, the trial court

15   concluded that Juror No. 4 was not biased.  There is nothing in the record to call this

16   determination into question.  Petitioner's claim of juror bias should be denied.

17           9.   <u>Improper Imposition of Enhancement Pursuant to Cal. Penal Code § 667.5</u>

18           Petitioner contends that the trial court improperly imposed a one-year enhancement

19   pursuant to Cal. Penal Code § 667.5 for a prior prison term which was actually a civil addict

20   commitment.  He states that a direct commitment to the CRC, such as suffered by Petitioner, does

21   not constitute a prior prison term under the State's statutory and decisional law.

22           It is well-settled that federal habeas relief is not available to state prisoners challenging

23   state law. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991) ("We have stated many times that federal

24   habeas corpus relief does not lie for errors of state law); <u>Langford v. Day</u>, 110 F.3d 1380, 1389

25   (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas

26   corpus" proceedings).

27           Petitioner challenges the state court's application of state sentencing laws.  Such a claim

28   does not give rise to a federal question cognizable on federal habeas review. <u>Lewis v. Jeffers</u>,

30

497 U.S. 764 (1990); <u>Sturm v. California Youth Authority</u>, 395 F.2d 446, 448 (9th Cir. 1967) ("a state court's interpretation of its [sentencing] statute does not raise a federal question"). Petitioner's conclusory assertion of a due process violation does not convert this state law question into a cognizable federal claim.  <u>Poland</u>, 169 F.3d at 584 (a petitioner may not transfer a state law issue into a federal one merely by asserting a violation of due process).

**IV.     RECOMMENDATION**

        Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

        This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

    Dated:   __**March 30, 2017**__              _____**/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE